IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRACY LYNNMARIE ERLICH LOWER, | ) | CASE NO. 1:21-CV-1528 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Tracy Lynnmarie Erlich Lower ("Plaintiff" or "Lower"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423,

1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final

decision is AFFIRMED.

## I. PROCEDURAL HISTORY

In October 2013, Lower filed applications for POD, DIB, and SSI, alleging a disability onset date

of October 1, 2011 and claiming she was disabled due to: uterine ablation, osteoarthritis, degenerative

spine disease, rheumatoid arthritis, chronic pain, mild depression, carpal tunnel, anemia, and intestinal

problems.  Transcript ("Tr.") at 27, 207, 212, 230.  Her applications were denied initially and upon

reconsideration.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

Lower has had three rounds of hearings and unfavorable decisions by three different ALJs.  Her first hearing was on January 12, 2016 (Tr. 42-62) and an ALJ issued an unfavorable decision on January 29, 2016 (Tr. 27-36).  Lower appealed to federal court and the district court reversed.  Tr. 990-999.  Lower's next hearing was on May 8, 2019 (Tr. 913-939) and an ALJ issued an unfavorable decision on July 5, 2019 (Tr. 893-904).  Lower appealed to federal court and the district court reversed.  Tr. 1455-1457.  Her third hearing was on May 21, 2021 (Tr. 1403-1431) and an ALJ issued an unfavorable decision on June 2, 2021 (Tr. 1374-1392).

On August 5, 2021, Lower filed her Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 11, 13, 15.  Lower asserts the following assignments of error:

> 1. The ALJ's determination is unsupported by substantial evidence as the ALJ failed to obtain an updated medical opinion despite the most recent determination being seven years out of date.
>
> 2. The ALJ's mental RFC determination is unsupported by substantial evidence as the ALJ failed to incorporate limitations to address the moderate limitations she found on Plaintiff's ability to concentrate, persist, or maintain pace or adapt and manage herself.

Doc. No. 11, p. 2.

## II. EVIDENCE

### A.  Personal and Vocational Evidence

Lower was born in 1969 and was 41 years old on her alleged disability onset date.  Tr. 1390.  She has at least a limited education and has past work as a housekeeper and stocker.  Tr. 1408-1409, 1426.

### B.  Relevant Medical Evidence[2]

**1. Physical impairments**.  In April 2012, Lower denied joint pain.  Tr. 312.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.  Lower did not cite evidence in the fact section of her brief, stating, "all relevant medical facts have been incorporated into the arguments below."  Doc. No. 11, p. 5.  In her argument section, she cited four pages of medical records from the over 2,000-page transcript.  The facts recited here are taken from Defendant's brief.

In November and December 2012 and January 2013, Lower was well-appearing and in no acute distress.  Tr. 370, 387, 407.  In February 2013 her physical exam findings were normal.  Tr. 555.  In October 2013 she was in no acute distress.  Tr. 806.  In November 2013, she denied joint pain.  Tr. 312. In March 2014, she was in no acute distress, had no tremors, and testing was inconsistent with a neurological disorder.  Tr. 614.  In June 2014 she had normal findings in her extremities and no focal deficits.  Tr. 639.

Lower has a history of carpal tunnel syndrome and bilateral carpal tunnel release surgeries.  Tr. 591, 706, 708.  In September 2013, she saw Christopher Cannell, M.D., who stated that her right ulnar nerve conduction studies were "completely normal" and that, despite her subjective complaints, there was no evidence of ulnar neuropathy at her wrist, elbow or brachial plexus, or cervical radiculopathy. Tr. 556.  In October 2013, she underwent right cubital tunnel decompression with medial epicondylectomy.   Tr. 700, 804.

In November 2013, Robert Gnade, M.D., Lower's primary care provider, completed a functional capacity evaluation consistent with less than sedentary work and incompatible with sustained, full-time work activity, including excessive absences and no significant ability to sit, stand, or walk at one time or total in a workday.  Tr. 588-589.

In January 2014, Lower saw Herbert Grodner, M.D., for a consultative exam.  Tr. 591-594. Upon exam, she had a normal gait without an ambulatory device and she could toe and heel walk and partially squat.  Tr. 592.  She had intact reflexes, alleged decreased sensation in her upper and lower right extremities, no atrophy, 5/5 strength, grossly normal grasp and manipulation, normal joints, reduced lumbar range of motion, lumbar tenderness, tender points consistent with fibromyalgia, and a positive straight leg raise test on the right.  Tr. 592-593.

In February 2014, an electromyogram (EMG) study of Lower's upper extremities showed mild

bilateral median nerve delay without evidence of brachial plexus disorder, cervical radiculopathy, myopathy, or motor neuron disease, and was described as normal.  Tr. 718.

An August 2014 lumbar MRI showed mild degenerative changes and minimal foraminal narrowing at L2-L4 with no significant canal stenosis at any level.  Tr. 691-692.

In November 2014, Dr. Gnade completed another residual functional capacity questionnaire and, while his assessment was less restrictive than his prior assessment, he still found that Lower's functional abilities were incompatible with sustained full-time work activity.  Tr. 631-632.

In October and November 2014, Lower appeared to be in a moderate level of distress but was able to ambulate independently.  Tr. 756.  A cervical spine x-ray in November 2014 showed a loss of lordosis and was otherwise unremarkable.  Tr. 679.  On January 16, 2015, she appeared to be in a moderate to severe level of distress but was able to ambulate independently and strength testing results were difficult to ascertain "due to the fact that she seemed to have give-way strength secondary to pain." Tr. 740.  On January 20, she was in no acute distress.  Tr. 861.

An x-ray of her right hip in June 2015 showed no acute findings.  Tr. 679.  She received regular hip injections.  Tr. 679-680.

An EMG study performed in January 2016 showed a very mild, insignificant abnormality that did not explain her complaints of electronic sensations in her feet.  Tr. 874.

Lower saw Dr. Gnade for regular visits.  His records, in general, did not include physical exam findings.  At various times, he indicated that Lower was ambulatory (Tr. 1319, 1320 (November, December 2016)); ambulatory and overall doing fairly well (Tr. 1218 (April 2017) Tr. 1304 (February 2018)); "quite stable" (Tr. 1301 (March 2018)); and not doing well (Tr. 1217 (April 2017)).  He attributed much of her discomfort to fibromyalgia.  Tr. 679.

In May 2017, Dr. Gnade completed a form on Lower's behalf regarding her disability

application; he was not interested in performing an exam.  Tr. 1213.  He did not answer most of the questions other than stating "See chart" and when asked if there were any issues with compliance or interference with treatment he wrote, "Patient."  Tr. 1214-1215.  When asked to describe Lower's work ability, he stated that she had reported working in her yard "pulling weeds, etc."  Tr. 1214.

In July 2017, Lower attended three physical therapy visits for her lumbar impairment and was discharged because she didn't return.  Tr. 690.

In July 2017, Lower saw a neurologist; upon exam, she was in no acute distress, had no tremor or atrophy, and diminished strength, 4/5.  Tr. 1276.  The neurologist suggested there was not a neurological cause for all her symptoms and "strongly recommended she stop smoking."  Tr. 1274.  In September, Dr. Gnade noted that Lower was physically active and he could not find anything on exam to explain her reported dizziness/vertigo.  Tr. 1306.

In August 2018, Lower went to the emergency room reporting a two-day history of right flank pain, rated 10/10.  Tr. 1280.  She denied back pain, dizziness, focal weakness, or seizures.  Tr. 1280.  Upon exam, she had normal musculoskeletal range of motion in her major joints with no edema, tenderness, or deformity and no focal weakness or tremor.  Tr. 1282.

In January 2021 Lower received bilateral lumbar facet blocks.  Tr. 1805.  Thereafter, she went to the emergency room for pain all over.  Tr. 1793.  Upon exam, she was in no distress and the note states, "Patient will not move her own extremities. When they are moved she holds them in position but states she cannot put them down.  There is no cogwheel rigidity. She does resist motion with trying to bend her legs." Tr. 1797.  She was given Benadryl and was thereafter able to move her extremities and there were no signs of spinal injury or neurologic damage.  Tr. 1799.  Later that month she had a normal appearance, was not ill-appearing, and had normal range of motion.  Tr. 2027.

A February 2021 MRI of her lumbar spine showed mild discogenic disease without central spinal

5

canal stenosis and mild foraminal stenosis at the L3-L4 level.  Tr. 1772-1773.  A February 2021 MRI of her right shoulder showed "a little tendinopathy" and some acromioclavicular joint arthritis.  Tr. 1783. She received a steroid injection in her right shoulder.  Tr. 1782.

At a subsequent visit for lumbar pain in February 2021, Lower had no positive trigger points and 5/5 muscle strength.  Tr. 1721.  She was weight bearing on each leg without difficulty.  Tr. 1721.  At another visit that month she stated that she could cook, clean, and bathe herself and denied needing home health care, stating that she was independent, with which her husband agreed.  Tr. 1737.

In May 2021, Lower saw an orthopedic surgeon for her right shoulder.  Tr. 2064.  Upon exam, she had decreased shoulder range of motion due to reported pain but her rotator cuff function was good and she was neurovascularly intact.  Tr. 2068.

**2.  Mental impairments.**  In April 2012, Lower denied depression and anxiety.  Tr. 312.

In November 2012, Lower's records included a diagnosis of depression.  Tr. 371.  Upon exam in November and December 2012 and October 2013, she was well-appearing, pleasant, cooperative, alert, fully oriented, and had an age-appropriate affect.  Tr. 370, 387, 407, 806.

In November 2013, Lower completed a function report stating that she lived in an apartment with her children, did light housekeeping, prepared meals, fed and watered her pet(s) daily, went outside daily, shopped twice a week for a few hours, had no problems getting along with others, had fair ability to follow instructions, tried to play with her granddaughter and had coffee with family and friends once a week, and could pay bills, count change, handle a checking account, and use a checkbook.  She wrote that she needed an alarm clock to remind her to take her medications, that her children helped her with tasks, that she did not have a driver's license, and she did not handle stress very well.  Tr. 249-256.

In January 2014, Lower saw James Tanley, Ph.D., for a consultative exam.  Tr. 600-604.  She was not seeing a mental health professional or taking psychoactive medication and her feelings were

"alright." Tr. 601. She described her daily activities: "I wake the kids, drink coffee, take my pills, shower, make the bed, wash the dishes. I do laundry. I start everything, but I can't finish 'cause of my pain. I grocery shop with food stamps." Tr. 601. She watched TV news and read when she had a good book. Tr. 601. Her radio was always on and she went to bed after the 10 p.m. news. Tr. 602. Upon exam, her affect was appropriate to thought content, she had good eye contact, was generally cooperative, was alert and fully oriented, and the balance of her exam findings were unremarkable. Tr. 602. Tanley diagnosed mild somatic symptom disorder, which "could" cause "a bit of a negative effect" in the domain responding appropriately to work pressures and responding to supervisors and coworkers; she had no limitations understanding, remembering and carrying out instructions or maintaining attention and concentration. Tr. 603-604.

In October 2014, Lower was alert, cooperative, appropriate, well-groomed, and had a normal affect and mood. Tr. 756.

In July 2016, Dr. Gnade commented that Lower was overall doing fairly well and was recently married. Tr. 1229.

In January and April 2017, Lower saw Dr. Gnade and reported that she was not doing well and was still very depressed. Tr. 1220, 1217. Dr. Gnade adjusted her medications.

In July 2017, Lower reported to social security that she did not see any mental health specialists for depression and that her anxiety and depression were treated by her primary care physician, Dr. Gnade. Tr. 1147. She reported issues focusing and concentrating, as well as nervousness around people. Tr. 1147. She shopped at the grocery store, was able to count change and handle her own finances, and could keep up with daily activities. Tr. 1147. She was noted to be polite and cooperative. Tr. 1147. At an appointment that month, Lower showed normal alertness, attention span, concentration, recent and remote memory, and fund of knowledge. Tr. 1275.

7

In March 2018, Lower saw Dr. Gnade and carried a diagnosis of anxiety state and moderate mood disorder. Tr. 1298-1299.

In September and November 2020, Lower had a normal mood, affect, speech, and behavior. Tr. 1683, 1700. In January and February 2021, she was awake, alert, well groomed, pleasant, cooperative, and oriented, with coherent thought processes, good insight, appropriate fund of knowledge, intact higher cognitive functions, and appropriate affect. Tr. 1720-1721, 1804.

In April 2021, Lower reported not taking hydroxyzine for anxiety because it did not help and reported that she was having panic attacks. Tr. 2014.

**C.      State Agency Reports**

In January 2014, Maureen Gallagher, D.O., reviewed Lower's record and, regarding her physical RFC, opined that she could perform light work with occasional postural activities, no climbing of ladders, ropes or scaffolds, and occasional use of her right upper extremity. Tr. 74-75. In May 2014, Leanne Bertani, M.D., reviewed Lower's record and found that she could perform light work but was limited to standing and walking four hours in a workday, could perform occasional postural limitations, no climbing of ladders, ropes or scaffolds, frequent pushing and pulling with her bilateral lower extremities, frequent handling and fingering bilaterally, and must avoid concentrated exposure to vibration and hazards. Tr. 105-107.

In February 2014, Vicki Warren, Ph.D., reviewed Lower's record, found none or mild mental functional limitations, and concluded that she did not have a severe mental impairment. Tr. 72. In May 2014, Cynthia Waggoner, Psy.D., agreed. Tr. 103.

**D.      Hearing Testimony**

During the May 21, 2021 hearing, Lower testified to the following:

- She lives with her husband and her two adult children.  Tr. 1422.  She has never had a driver's license and does not know how to drive; she grew up in New York City.  Tr. 1423, 1417.

- When asked why she was unable to do her past jobs as a housekeeper and stocker at Walmart, she answered: quarantine, having carpal tunnel surgery in both hands, and right elbow surgery.  Tr. 1409.  She can't lift anything because her hands don't work.  Tr. 1410. She can't walk a lot because of her back pain and leg pain from her hip.  Tr. 1410.  She has vertigo and has been having episodes since January.  Tr. 1410.  She's being treated for seizures.  Tr. 1410.  She has had chronic pain since 2005; now it is barely manageable.  Tr. 1410.  She has arthritis and fibromyalgia.  Tr. 1410.  She has fibromyalgia pain everywhere, every day; "it feels like my body is tingling and zapping all day long."  Tr. 1410-1411.

- For treatment, she is taking Lyrica again; she has to take a low dose.  Tr. 1411.  She can't play with her grandchildren, go for walks, or go shopping for long; everything is limited to a few feet in the house or outside.  Tr. 1411.  When asked about her hands, she stated that she had had surgery and therapy.  Tr. 1411.  They wanted to go in and do something else but they can't or her hands would be totally useless.  Tr. 1411.  Now her hands don't close properly and she doesn't have strength in them.  Tr. 1411.  She uses two hands and her chest to lift a gallon of milk.  Tr. 1412.

- When asked about her right shoulder, she said that she is "working on" it.  Tr. 1413.  She has "a knob or something" and the pain is excruciating.  Tr. 1413.  She can't lift her arm up to reach in a cabinet unless she twists her body to the left.  Tr. 1413.  The doctors are going to do something about that.  Tr. 1413.  When asked about her vertigo, she stated that she had her first big episode in January.  Tr. 1413-1414.  She was putting away Christmas items and sat down and said she did not feel well.  Tr. 1414.  She could not respond to her husband and he called an ambulance because they thought she was having a stroke.  Tr. 1414.  Sometimes she loses speech, the endings of words, she'll get confused, and she will stutter.  Tr. 1414. It's worse when she gets excited.  Tr. 1414.  They are going to do a 3-day brain study.  Tr. 1414.  They are treating it like vertigo, but it's not vertigo; she is on vertigo medication but it does not help.  Tr. 1414-1415.  She also takes anxiety pills.  Tr. 1415.

- When asked if she receives mental health treatment, she stated, "No.  I haven't gone and seen anybody officially."  Tr. 1416.  She takes medication for panic attacks and Effexor for mood.  Tr. 1416.  When asked if she has problems getting along with others, she stated that she sticks to herself because she can't be around her grandchildren.  Tr. 1416.  Her kids are around and her husband is around.  Tr. 1416.  She doesn't go out to see friends anymore because she doesn't know when she is going to have an episode.  Tr. 1416.

- When asked how far she could walk prior to 2016, she that she could walk a little bit; a block or so, but she would have more pain.  Tr. 1417.  She has never used a cane.  Tr. 1417. She could stand for a couple hours.  Tr. 1417.  She could not lift much.  Tr. 1417.  When asked how things have changed in the last few years, she stated that now she was lucky if she could walk from the house to the car, and when she gets into a store she usually sits or stands by the registers while her husband shops.  Tr. 1418.  She can stand for about 10

9

minutes at a time and for about 2 hours total during the day because of her vertigo.  Tr. 1418-1419.  She can sit for 5 minutes, if that.  Tr. 1419.  She is able to dress and bathe, although she can't tie shoes anymore, she slips them on.  Tr. 1419.

- Five years ago she could do household chores, they would just take her longer.  Tr. 1419-1420.  She would start it and then someone would come and finish it.  Tr. 1420.  She no longer does chores; she estimated she stopped doing them about October 2020.  Tr. 1420.  Five years ago she could go to the store; now she can't walk around the store.  Tr. 1420.

- On a typical day, she wakes up, makes a cup of coffee, puts the cup in the sink, goes upstairs, takes a shower, gets dressed, and sits in her chair.  Tr. 1420.  She makes the bed, which takes her about 15 minutes, and then she has to sit again.  Tr. 1421.  If she has to cook dinner she gets started.  Tr. 1421.  She can prep and use utensils; someone else has to lift the pots to put them on the stove.  Tr. 1421, 1424.

The VE confirmed that Lower's past relevant work was as a cleaner and a stocker.  Tr. 1426.

The ALJ asked the VE whether a hypothetical individual with the same age, education, background, and work experience as Lower could perform Lower's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 1426-1427.  The VE answered that such an individual could not perform Lower's past work but could perform the following representative jobs in the economy: cashier, photocopy machine operator, and front desk clerk.  Tr. 1427.

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

10

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016 (Ex. 11D).

2.     The claimant has not engaged in substantial gainful activity since October 1, 2011, her alleged onset date of disability (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: lumbar degenerative disc disease (DDD) with stenosis and radicular symptoms; osteoarthritis (OA) of the right hip; right shoulder arthritis; fibromyalgia; rheumatoid arthritis (RA); bilateral carpal tunnel syndrome (CTS); obesity with history of gastric bypass surgery; diabetes mellitus (DM); right elbow impairment status/post surgery; somatoform disorder; and affective and anxiety-related disorders (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     The claimant has the residual functional capacity (RFC) to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 4 hours total in a workday; sit for 6 hours total in a workday; frequently push, pull, and/or operate foot controls with the bilateral lower extremities; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and crawl; frequently handle, finger, and feel with her bilateral upper extremities; and occasionally reach overhead with her right upper extremity. She can have occasional concentrated exposure to extreme cold and vibrations and must avoid hazards, including moving machinery, heavy machinery, and unprotected heights. She requires the option to be off task 20 minutes a day spread throughout the course of the day in increments of 3 to 4 minutes.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on November **, 1969, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. She subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a limited education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 CFR 404.1569, 404.1569(a,) 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 1376-1392.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ was not required to obtain an updated medical opinion

Lower argues that the ALJ's RFC assessment is unsupported by substantial evidence because the ALJ "failed to obtain an updated medical opinion despite the most recent determination being seven years out of date." Doc. No. 11, p. 6. She also asserts, "the ALJ failed to discharge her duty to develop the record and obtain an updated medical opinion regarding whether Plaintiff's physical impairments medically equaled a listing." Doc. No. 11, p. 6. In support of her arguments, Lower cites to four pages of medical records describing three visits to medical providers: a record showing "decreased strength,

antalgic gait, and decreased range of motion" (Tr. 1700); a record showing mild right hip osteoarthritis (Tr. 1186); and a record showing right shoulder arthritis (Tr. 1791-1792).  Doc. No. 11, p. 7.

As an initial matter, it is Lower, not the ALJ, who has the burden to provide medical evidence showing that she has an impairment, how severe it is, and how it affects her functioning during the time she claims to be disabled.  *See* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled.  You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your case.").[3]  While the ALJ has a heightened duty to develop the record for a *pro se* claimant under certain circumstances, *see, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 280 F.App'x 456, 459 (6th Cir. 2008), Lower was not proceeding *pro se* and the ALJ did not have a heightened duty to develop the record in her case.

Next, pursuant to Social Security Ruling 96–6p, an ALJ is required to obtain an updated medical opinion when the ALJ believes that "there is evidence of symptoms signs and findings that suggest" the claimant's condition may be equivalent to a listed impairment or "when additional medical evidence is received" that the ALJ believes "may change the State agency medical or psychological consultant's finding that the impairment does not equal the listings."  1996 WL 374180, at *3-4 (July 2, 1996); *Kelly v. Comm'r of Soc. Sec.*, 314 F.App'x 827, 830 (6th Cir. 2009); *Courter v. Comm'r of Soc. Sec.*, 479 F.App'x 713, 724 (6th Cir. 2012).  Here, the ALJ found that the evidence did not show that Lower's conditions, alone or in combination, equaled a listed impairment.  Tr. 1378-1383.  Lower argues, "the evidence reveals new findings that raise the question of whether Plaintiff's impairments, singly or in combination, medically equal a listing."  Doc. No. 11, p. 9.  In support, she refers to one medical record that shows she had "decreased strength" and states that that record "certainly gives rise to the ALJ's

---

[3]  The version of 20 C.F.R. 404.1512 quoted above is the version that was in effect at the time Lower filed her applications in 2013.  Although the wording has changed in the newer versions of that regulation, the sentiment has not.

duty to develop the record and obtain a medical opinion regarding whether Plaintiff's impairments medically equaled a listing."  Doc. No. 11, p. 10.  She does not explain how that finding raises a question regarding whether she equals a listing such that the ALJ was required to obtain an updated medical opinion.  She does not even identify what listing she believes her impairments equal.  Indeed, at the hearing the ALJ asked Lower's counsel whether Lower's impairments "met or equaled the listings, or is this a Step 5?" and counsel answered, "It's a Step 5, your honor."  Tr. 1406.  Thus, the Court finds that Lower has not shown that the ALJ was required to obtain an updated medical opinion to determine whether her impairments equaled a listing pursuant to SSR 96-6p.  *See Courter*, 479 F.App'x at 724.

Lower argues that the ALJ's reliance upon the state agency reviewers' opinions was improper because those opinions were issued seven years prior to the ALJ's decision.  Doc. No. 11, p. 7; Doc. No. 15, pp. 2-4.  But it is not error for the ALJ to rely on state agency reviewers' opinions based on an incomplete record so long as the ALJ considered the later evidence.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) ("Even if [the State agency physician's] RFC was completed without knowledge of these [medical] issues, however, the record reflects that the ALJ considered them.");  *Minyard v. Berryhill*, 2019 WL 1099552, at *5 (N.D. Ohio Mar. 8, 2019) ("[i]t is clear from the ALJ's discussion of the evidence in the decision that it was known that medical evidence existed that post-dated the opinion evidence and that the ALJ considered the opinion evidence with that evidence in mind.").  Lower cites *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) and *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016), but in those cases the Court reversed because the ALJ relied on state agency reviewers' opinions without considering evidence that post-dated those opinions.  *Id.*; *Blakely*, 581 F.3d at 409 ("We require some indication that the ALJ at least considered these [new] facts before giving greater weight to an opinion that is not based on a review of a complete case record.") (cleaned up).  Here, the ALJ considered the new evidence in the record.  Thus, Lower has

16

not shown that the ALJ's reliance upon the state agency reviewers' opinions was improper.

Lower asserts that there are no medical opinions regarding her physical impairments in the record after 2014.  Doc. No. 11, p. 7.  Thus, she states, "there was no medical professional to interpret the raw medical data of seven years of evidence into functional limitations" and the ALJ erred when she "interpreted the raw medical data of Plaintiff's MRI findings into her RFC."  Doc. No. 11, pp. 7, 9.  In *Rudd v. Comm'r of Soc. Sec.*, 531 F.App'x 719, 726-727 (6th Cir. 2012), the Court rejected an argument that the ALJ "improperly substitute[ed] her own medical judgment for that of medical experts":

> The ALJ was not required to obtain a medical expert to interpret the medical evidence related to his physical impairments. In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir.2004) (stating that "the ALJ is charged with the responsibility of evaluating the medical evidence"); *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed.Appx. 435, 439 (6th Cir.2010) ("The Social Security Act instructs that the ALJ not a physician ultimately determines a claimant's RFC.... An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."). In other words, the ALJ was not required to obtain a medical expert to interpret the medical evidence related to Rudd's impairments.[] Furthermore, the ALJ did not interpret raw medical data beyond her ability. The x-rays of Rudd's hands and lumbar spine, which were the only raw medical data, had already been read and interpreted by a radiologist. The ALJ's conclusions regarding Rudd's lumbar spine and hands were consistent with the technician's interpretation of the x-rays. Thus, the ALJ properly evaluated the evidence of Rudd's physical condition without the assistance of a medical expert.

*Id.*; *see also Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009); *Giacomelli v. Berryhill*, 2019 WL 2492298, at *9 (N.D. Ohio June 14, 2019).  Here, the ALJ cited MRI findings and the medical provider's interpretations, which assessed normal or mild findings.  Tr. 1377, 1378, 1385, 1386.  Lower does not identify the MRI findings she believes the ALJ cited in error.  Thus, her challenge amounts to an endorsement of a *per se* rule, which is not warranted.  *See Rudd, supra*.  The Court finds that Lower has not shown that the ALJ erred when she relied upon MRI findings that were interpreted by a medical provider.

In sum, Lower's arguments presented in her brief are long are generalizations and case citations

17

(which are either unpersuasive or not on point) and short on facts.  Beyond complaining that the ALJ did not obtain an updated medical opinion, she does not challenge the ALJ's substantive evaluation of the evidence, which spanned six pages at step three (Tr. 1378-1383) and seven pages discussing her RFC assessment (Tr. 1384-1390).  Despite noting that the record is over 2,000 pages long, Lower has only cited four pages of medical evidence.  She has not shown that the ALJ erred by not obtaining an updated medical opinion.

**B. The ALJ did not err with respect to the mental limitations in the RFC**

Lower argues that the ALJ evaluated her impairments under the paragraph B criteria at step three and found her to have moderate limitations in the ability to concentrate, persist, and maintain pace and adapt and manage herself, but the ALJ's RFC assessment contained one, inconsistent limitation: Lower would have the option to be off task 20 minutes a day spread throughout the course of the day in increments of 3 to 4 minutes.  Doc. No. 11, pp. 10-11; Tr. 1384.  In support of her argument, she cites *Ealy*, 594 F.3d at 516-517.  In *Ealy*, the ALJ relied on opinion evidence assessing functional limitations and failed to include those limitations in the claimant's RFC assessment and hypothetical question to the VE.  *Id*.  Here, in contrast, the "moderate" findings Lower cites were assessed by the ALJ at step three, which is separate from an RFC assessment.  *See, e.g., Pinkard v. Comm'r of Soc. Sec. Admin*., 2014 WL 3389206, at *10 (N.D. Ohio July 9, 2014) ("[T]he ALJ does not have to include paragraph B finding in his RFC finding.  Paragraph B findings under the listings are findings at step three of the sequential evaluation process, and are not RFC findings pertaining to steps four and five of the sequential evaluation process.");  SSR 96-8P, 1996 WL 374184 at *4 (July 2, 1996).  Thus, the Court finds that the ALJ did not err when she did not include her paragraph B findings in her RFC assessment.

Next, Lower contends that the ALJ did not explain "why she did not include any functional limitations resulting from the moderate limitations she found in her Listing analysis."  Doc. No. 11, pp.

18

12-14; Doc. No. 15, p. 5.  However, as explained above, the ALJ's step three findings are not RFC

findings.  Furthermore, the ALJ did provide an explanation:

> As noted in Finding 3 above, the record documents the claimant's reports of mental symptomatology, related diagnoses, and related prescribed medications, but does not generally document significant, persistent mental status exam findings related to such symptomatology that would warrant substantial mental work-related limitations to her RFC. Rather, as summarized above, exam findings have routinely documented normal mental status functioning, such as intact memory and thought process, normal attention and concentration, pleasant demeanor, full orientation and alertness. However, due to her somatoform disorder and some reports of depression, anxiety, and panic, in combination with her pain complaints, she would have some limitations with respect to adapting to tasks, concentrating, and persisting, such that she reasonably requires the option to be off task 20 minutes a day spread throughout the course of the day in increments of 3 to 4 minutes.

Tr. 1387.  Lower does not challenge the ALJ's description of the evidence, she does not make a

substantive argument regarding the ALJ's evaluation of the opinion evidence, and she ignores the ALJ's

explanation cited above.  She again complains that the opinion evidence predates the ALJ's decision by

seven years but does not cite a single page of evidence regarding her mental impairments or develop a

fact-based argument regarding the ALJ's findings.[4]  Thus, the Court finds that she has failed to show

that the ALJ erred when she evaluated her mental impairments or that the ALJ's decision is unsupported

by substantial evidence.  Accordingly, the ALJ's decision is affirmed.

### VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

Date: May 9, 2022

     *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

---

[4] In her reply brief, Lower references the ALJ's decision in 2016 (Doc. No. 15, p. 5) but it is not clear why.  The relevant decision at issue in this case is the ALJ's 2021 decision.